No. 2629.

HENRY SHAMBURGER *v.* THE STATE.

1. PRACTICE—EVIDENCE—JURISDICTION is a question addressed to the court alone, and is not a subject for the consideration of the jury. Under this rule, the admission in evidence before the jury of the order changing the venue in the case because of prejudice against the accused, was erroneous. See the opinion in extenso on the question.

2. SAME.—The admission in evidence of the order changing the venue was otherwise material error, under the rules that "evidence, to be admissible, must relate to relevant facts in issue," and that "a defendant is entitled to a verdict on competent evidence, and the admission, over his objection, of incompetent evidence which might influence a jury to his prejudice, requires a conviction to be set aside, even though there be sufficient legal evidence to sustain it." Note also the suggestion of this court, that the error of admitting the order changing the venue, intensified as it was by comment of prosecuting counsel, could not be cured by an instruction to the jury to ignore the change of the venue.

3. MURDER—CHARGE OF THE COURT—BURDEN OF PROOF.—The defense interposed to this prosecution was that the deceased fired the fatal shot and killed herself. Upon that issue the trial court charged as follows: "If, from the evidence, you believe that Anna Smith took her own life, and that the fatal shot which deprived her of life was not fired by the defendant, but by her own hand, or by any other means than the act of the defendant, then he is not guilty, and you should so find." *Held:* That the charge was erroneous because it imposed upon the accused the burden of proving his innocence. The instruction should have been to the effect that if, from all the evidence, the jury entertained a reasonable doubt whether the defendant killed the deceased, or whether the deceased killed herself, they should acquit him.

APPEAL from the District Court of Kaufman. Tried below before the Hon. S. R. Frost, on exchange.

The indictment in this case was presented in the district court of Hunt county, Texas, on the fourteenth day of July, 1885. It charged the appellant with the murder of Anna Smith, in said Hunt county, on the second day of July, 1885. At its February term, 1886, the district court of Hunt county, upon the application of the appellant, entered its order changing the venue to the county of Kaufman. This trial, which was had in the district court of Kaufman county, in July, 1887, resulted in the conviction of the appellant for murder in the second degree, and

his penalty was assessed at a term of ten years in the penitentiary.

The proceedings had upon the appellant's habeas corpus trial for bail have been condensed in the nineteenth volume of these Reports, beginning on page 572. Several of the witnesses who gave evidence on the said habeas corpus proceedings testified upon trial, but much more in detail. The evidence of said witnesses will be merely summarized in this report.

Mansel Mathews was the first witness introduced by the State He testified that, in July, 1885, he lived in the town of Greenville, Hunt county, and at that time knew both the deceased and the defendant. The deceased came to her death on the morning of July 2, 1885, at a point in Hunt county, about one mile north of Payne's store, and about six miles north of Roberts Station. A few days prior to July 1, 1885, Miss Lou Vansickle informed the witness that there was to be a ball at Roberts Station on the night of July 1. On that day the defendant asked the witness if he intended to attend the ball. During that day, Miss Lou Vansickle and Miss Anna Smith came to town, and witness and defendant arranged to escort them to the ball, the witness to take Miss Vansickle, and the defendant to take Miss Smith. On that afternoon the witness and the defendant, each taking a buggy and team from the witness's livery stable, drove out to the house of Miles Vansickle, got the girls, and drove with them to the ball at Roberts Station, Miss Vansickle going in the buggy with witness, and Miss Smith going in the buggy with the defendant. They left the ball at about two o'clock a. m., on July 2, defendant and Miss Smith going in advance. When witness and Miss Vansickle, on their way home, reached a point about a mile north of Payne's store, they found Miss Smith sitting under a tree by the roadside. It was then but a few minutes before daylight, and it was the first the witness had seen of Miss Smith since she left the ball at the station. Defendant at that time was standing on the ground in front of his horses, about one hundred yards further up the road. Miss Vansickle asked Miss Smith to get in the buggy and ride with her and the witness, which Miss Smith refused to do. Miss Smith explained that she and the defendant had quarreled, and that she had left his buggy and refused to ride with him. Miss Vansickle persisted in her effort to get Miss Smith to share witness's buggy with her. Miss Smith, however, as persistently refused, remarking that she had disgraced herself, and would not disgrace Miss Vansickle, and that

she expected to stay where she was until she died.   Witness and
Miss Vansickle then drove on to where the defendant was stand-
ing at the head of the horses.   He said that he and Miss Smith
had quarreled, and that Miss Smith left the buggy, declaring that
she would not ride with him.   He appeared to be considerably
annoyed by Miss Smith's refusal to continue the ride with him.
Witness told him to go back and get Miss Smith.   He replied
that he would go back and try to get her, if witness would hold
his horses.   Witness got out of his buggy, and defendant went
back towards Miss Smith.   Witness then unhitched the traces of
the defendant's horses, and tied the lines to the dash board.   He
then waited until he heard the defendant and Miss Smith coming,
when he and Miss Vansickle drove on toward Greenville.   Wit-
ness and Miss Vansickle had driven not above two miles, when
they heard the rapid approach from behind of a buggy and team.
They soon discovered it to be the unoccupied buggy and team of
the defendant, the lines still attached to the dash board, as wit-
ness had left them.   Witness got out of his buggy, caught and
hitched the team, and he and Miss Vansickle then drove back
over the road they had just traveled, until they reached Powell's
house, where they found the defendant.   Defendant, who had
his pistol in his hand, got into their buggy, and witness and Miss
Vansickle drove back with him to where they first left his buggy
standing, that point being about one hundred yards from the tree
under which the witness last saw Miss Smith sitting.   At that
point they found the dead body of Miss Anna Smith, lying by the
road side.

Upon reaching the place where the body lay, the defendant
got out of the buggy, lay down along side the body, and put his
left arm under the head, while he held his right hand, still grasp-
ing the pistol, behind his back.   Witness requested Miss Van-
sickle to get out of the buggy and get defendant's pistol; which
she did, and then got back into the buggy.   Defendant had pre-
viously refused to surrender the pistol to the witness.   Witness
and Miss Vansickle then drove off towards the branch, and Miss
Vansickle fired off the two loads then remaining in the pistol.
They then turned and drove around the defendant and the de-
ceased, and left.   Defendant, when found by witness and Miss
Vansickle at Powell's, just before the discovery of the dead
body, appeared very reckless, and much distressed, and held his
pistol in his hand all the time until it was taken, at the body, by
Miss Vansickle.   Witness did not see defendant after leaving

Roberts Station, until he found him standing at the head of his horses in the road, near where Miss Smith afterwards met her death, which was about six miles distant from Roberts Station. It was between four and five o'clock in the morning when he overtook defendant. He was overtaken by the empty buggy and team about thirty minutes after he left the said buggy in the road.

Cross examined, the witness said that Miles Vansickle, the father of Miss Lou, lived about ten miles from Greenville, and about eight miles from Roberts Station. The several parties, bound for Roberts Station, left Miles Vansickle's house about sun down, deceased and defendant traveling in advance. At a point about two miles from Vansickle's, witness and Miss Lou found defendant and deceased waiting for them. Witness then produced a bottle of whisky and a package of candy. Witness, defendant and Miss Smith each took a drink of whisky, and Miss Vansickle took some of the candy. The party then proceeded in the same order. Just before reaching Roberts Station witness and Miss Vansickle again overtook defendant and Miss Smith, and the two latter and witness took another drink of whisky. The parties then entered the hotel at the station, and joined the dancers. Witness danced the first set with Miss Vansickle, and the second with Miss Smith. Defendant danced the first set with Miss Smith and the second with Miss Vansickle. After the second dance, witness and Miss Vansickle, and defendant and Miss Smith, left the ball room and took a stroll. There were then no residences about Roberts Station. If Miss Smith drank any whisky after she got to the station the witness did not remember it, but she drank every time, en route there, that witness and defendant did.

On the return home, the witness, just after leaving the station, left the main road and took an inferior road which rejoined the main road about a mile further on. A heavy rain had recently fallen and the roads were somewhat heavy. Witness drove as rapidly as he could through the darkness and over the heavy roads, but did not get in sight of defendant and Miss Smith until he found Miss Smith, as stated, beyond Payne's, sitting under the tree, and the defendant in the road, a hundred yards further on.

From this point the witness repeated in detail his narrative on his direct examination, and stated that, when he found the defendant at Powell's, after Miss Smith's death, but before he

(witness) had seen the body, the defendant was hallooing, cry-ing, moaning and "taking on terribly." He then stepped up to witness's buggy, with his pistol in his hand, and said that Anna Smith had killed herself; that, just as he was hitching the last trace, Anna jerked his pistol out of his hip pocket and, before he could interfere, shot herself; that then, as soon as he could, he took the pistol and shot himself, intending to kill himself, but lost his nerve and failed. He then climbed into the witness's buggy and told witness that Anna's body was at the point on the road where witness left the buggy, and directed the witness to drive rapidly to that place; which the witness did. On reaching the body, the defendant sprang from the buggy, and threw him-self down by the body, in the manner described by the witness on his direct examination. He wept violently and boisterously, and said that if he had the nerve he would kill himself. He ap-peared to be so frantic and distraught that witness became some-what apprehensive that he would do violence to himself. Miss Vansickle then secured his pistol, and she and witness drove back towards the branch near where they had last seen Miss Smith alive, when Miss Vansickle emptied the pistol by dis-charging it. Anna Smith was shot over the left breast, and was powder burned. Defendant was shot in the left shoulder, and was powder burned.

On re-direct examination, the witness said that Miss Van-sickle did not drink any whisky at any time on the tragic night, but drank some blackberry brandy. The roads were too muddy to admit of very rapid driving. Witness had been to Roberts Station but once since the tragedy. Shortly after he and Miss Vansickle left the defendant and the body of the deceased, they met Mr. J. R. Powell and another man going to the body. They were then about three hundred yards from the body. The wit-ness had often seen the defendant before the night in question, but had never attended a social gathering with him before. Witness did not attempt to disarm the defendant after the trag-edy, because he was himself unarmed, and feared that defend-ant, in his then mental condition, would resist to the extent of doing violence. Previous to this night, the witness had heard the defendant speak of receiving letters from Anna Smith, but did not remember that defendant ever said that he was going to marry her. When defendant got in witness's buggy at Powell's he said to witness: "Drive them horses, and drive them d—d quick."

T. J. Humphreys testified, for the State, that in 1885 he was the justice of the peace of the Roberts Station precinct in Hunt county, Texas. As such officer he held the inquest over the dead body of Anna Smith, which he found in the public road, about six miles from Roberts Station, and about a half a mile north of Payne's store. Several persons, including the defendant, were present when witness reached the body. Miss Vansickle produced a forty-eight calibre pistol, between fourteen and sixteen inches long, which she said belonged to the defendant. Witness saw a rope in the possession of Mr. Powell which had some knots and loops in it. The two loops were about three inches in diameter and about six inches apart. The rope was of sea grass, such as is used for horse hopples. A large tree stood about one hundred yards from where the body lay. There were tracks about the body of the tree, and at its foot an imprint left by some person who had sat there. Witness observed nothing wrong about the clothing of the deceased, except a bullet hole over the left breast, at which point the dress was powder-burned. The dress on the body was of white material, and the basque of black velvet. Witness did not see a pool of blood about the body. He impaneled a jury of inquest, and had the body placed in a wagon and taken to Payne's store. Witness saw no woman tracks about the tree referred to. The ball entered the body just above the left nipple, and passed straight through the body. Witness also observed a bruise on the girl's shin, and some bruises on her thigh. Deceased was a small woman, under the medium size.

On his cross examination, the witness stated that the bruises on the shin and thigh of the deceased were purple in color. He could not tell how old they were. The bruises on the thigh were not so purple or blue as the one on the shin. Witness reached the body about eight o'clock, and had it removed to Payne's store about ten o'clock. On his re-examination the witness said that, about thirty minutes after he reached the body, he placed the defendant under arrest. He, defendant, was wounded through the muscles of the left shoulder. When he arrested defendant the witness threw his arms around defendant from behind, and told him to consider himself a prisoner, and to surrender his pistol if he had one. Defendant replied: "If I had a pistol, I would settle it with you and myself." Defendant had been kneeling by the body, "taking on" a good deal, and exclaiming that he would give worlds to be able to recall six hours.

On re-cross examination the witness said that, in "taking on," the defendant "took on" like one bewailing the loss of a friend. He cried and moaned and "took on" like one crazy or heart-broken. He apostrophized the girl as his lost love, and declared his wish that he had had the nerve to have died with her. He made no effort to escape.

J. R. Powell testified, for the State, that he lived about a mile from the point on the road where, in the early morning of July 2, 1885, the dead body of Miss Anna Smith was found. At barely daylight on that morning the witness heard four reports of a pistol. The second shot was fired a few seconds after the first, and the third and fourth shots were then fired in rapid succession. But a short time before he heard the shots, the witness saw a gentleman and lady in a buggy traveling north. Within a few minutes after the shots were fired, the defendant and a man named Williams, a stranger to the witness, came to the witness's house. Defendant, who then had his pistol in his hand, told the witness that "one of his loves" had shot and killed herself, and that her body was lying in the road. He then said that he wanted a horse to follow his team, which had broken away from him. Witness told him that he had but one horse, which he was going to use, and could not let him have it. Defendant then threw up his hand and asked: "What would you do if I should say that I am going to have one?" Witness then told defendant to wait until he got his shoes on, when he would get a horse and go with him. Defendant was then crying, moaning and "going on" like a person in great distress. About the time that witness got his shoes on, Mansel Mathews and Miss Lou Vansickle arrived in a buggy. Defendant said: "Thank God, there comes Mathews!" He then went to and got in the buggy with Mathews and Miss Vansickle, told them about the girl killing herself and directed Mathews to drive rapidly to the body. They left, and witness presently followed. En route to the body he heard two more pistol shots, and soon saw Mathews and Miss Vansickle returning in the buggy. Witness went on to the body, where he found the defendant and nobody else. He was lying by the body, weeping and "taking on" violently. He exclaimed that he would give the world to be able to call back only six hours; that he had promised the girl to die with her, but that his nerve failed him. After lying by the body for about thirty minutes, defendant got up and witness observed a note on the ground, which he picked up. Defendant snatched it from wit-

ness's hand, tore it in two, read the part that remained in his hand and then threw it down, and witness again picked it up. Defendant went to the branch several times to get water. He asked witness to raise the girl's head, which the witness did, and he then placed his coat under it. He then said that the body ought to .be shaded, and proposed to pay witness to attend to it. Witness then cut some brush which he arranged over the body.

Very near the road, and about one hundred yards south of where the body lay, was a tree in the sand, at the roots of which the witness observed the impression left by some person who had sat there. There were the tracks of both a man and woman about the roots of that tree, and also an impression made by the heel, toe or side of a foot. The tracks of a man and woman led from that tree up the road to a point about opposite the point where Charley Simmons claimed to have seen a pool of blood. Witness saw no woman's tracks beyond that point, although for a short distance, until it reached hard ground, the soil was soft enough to retain the impression of a foot. Witness could see tracks on the hard ground, but they were too indistinct to show whether they were made by the feet of a man or a woman. Near the place in the road where the hind wheels of a buggy had stood, the witness found a strand of a three-quarter inch sea grass rope, which said rope was slightly stained either with blood or paint. There were two loops in that rope, about a foot apart, one of the loops being partially drawn out. Witness could not remember exactly what the defendant said in connection with his statement about having tried to kill himself, but it was something to the effect that he might as well have done so, as he would "be hung any how." The witness saw about half a tea-cup of blood at the point where the body lay. Defendant told witness how the girl got his pistol, but witness could not now recall his statement in that connection.

On his cross examination, the witness said that he was sitting on the side of his bed, dressing, having just gotten up, when the defendant and Williams came to his house. He had not seen the man Williams since the defendant's habeas corpus trial in November, 1885. The first four shots mentioned by the witness were all fired within ten seconds. Defendant was weeping and moaning during the whole time that he was at witness's house on that morning, but when he saw Matthews and Miss Vansickle coming to the house his face brightened perceptibly, and he said earn-

estly: "Thank God, there they come!" It was a mile from witness's house to the point where the body was found, and a mile thence to Payne's store. The soil in that part of the country was very sandy, and the ground was heavily timbered. The witness saw no pool of blood, nor any blood except the small quantity he saw at the place where the body lay. Several days after the tragedy, and after a rain had fallen, Charley Simmons showed the witness a small spot near an elm tree, about ten steps from where the body was found; but that spot was clean, and looked to the witness like discoloration produced by the urine of a horse. Mr. Merchant's horse was hitched to that elm tree on the day the body was found and examined. Witness looked all around that place on the day of the tragedy, but discovered no blood; and he was satisfied, if there had been any blood there on that day, he would have discovered it. The place under the large tree, where the witness saw the impression of a sitting person, was a sand drift, and it extended up to the tree. The impression on it appeared to have been made by the body of a person in either a sitting or lying posture. The foot impressions were about three feet from the roots of the tree. The ravel of grass rope was found in the middle of the road. It may have been either rust, blood or paint on the rope. There was a place on the road, about six hundred yards from the place of the tragedy, where a man had camped. Witness followed the tracks of a man from that camp to the place of the tragedy, and then to his house, and presumed that those tracks were made by the man Williams.

Doctor T. E. Yoakum was the next witness for the State. He testified that he was present at the inquest upon the body of the deceased, which was held at Payne's store, in Hunt county, Texas, on July 2, 1885. He made a close and critical examination of the body, and discovered that the cause of the girl's death was a gun shot which entered her left breast between the third and fourth ribs, and passed straight through the body. He saw three purple bruises on the inside of the right thigh, which were of the shape and size of finger nail prints. There was also a small bruise on the inside of the forefinger on the right hand, between the first and second joints. Witness saw no other bruises on the body. He made a vaginal examination with an instrument. He found the vagina enlarged and relaxed, and filled with a secretion which he took to be male semen. He, however, was not positive as to the character of the secretion, but was satisfied that whatever it was, it was deposited but a

short time before death. There was no bruise on the left leg. The girl would weigh about one hundred and twenty-five pounds, and was about medium size. As a general rule, the arms of a woman are shorter than those of a man. Witness saw a long pistol at the inquest. On his cross examination, this witness stated that if the girl's heart was in a normal position, the bullet would have passed through the upper part of it. The effect of lacing is to force the heart upward a little. If the girl's heart was so elevated by tight lacing where she was shot, the ball pierced the organs of the heart. Paralysis of the heart, in that event, ensued instantly, and prevented the flow of more than a very little blood. On his re-examination, the witness stated that if the ball struck the artery above the heart, the girl could not have taken more than one or two steps after receiving the shot. If her heart was in its normal position the ball would have pierced an artery and produced a considerable flow of blood. The position of the body after it has fallen has much to do with the quantity of blood that escapes through a wound. The body of an average sized woman contains from fifteen to eighteen pounds of blood. If the ball had cut the artery above the heart, at least twenty-five per cent of the blood in the body should have escaped. If the ball punctured the muscles of the heart, death resulted almost instantly, with little loss of blood. It would have required a post mortem examination to determine accurately the quantity of blood discharged through the wound.

Charley Simmons testified, for the State, that he was at the place of the tragedy on the day after the body of the deceased was found. At a point ten or fifteen feet from the road, and about twenty steps from the tree under which the girl was said to have sat, and about seventy-five or eighty yards from where a buggy had stood in the road, the witness saw a pool of blood which must have originally contained as much as a gallon. It covered a space as large as a hat. Witness showed that place to J. R. Powell four or five days later. On his cross examination, the witness said that the weeds about the pool of blood that he saw had been mashed down. The pool was an inch deep, and was a foot across. The said pool was near an elm tree, and had a thin scum of blood over it when witness saw it. Mr. Powell was the first man witness told about the pool of blood, or showed it to except his father, brother and a Mr. Baird, whom he told of his discovery. Witness's little brother was with him when he found the pool of blood. Witness lived with

his father about two hundred yards from Payne's store. He was at Payne's store during the inquest, knew what was going on, and saw the defendant there.

John Hunter testified, for the State, that he was the mail carrier between Greenville and Payne's store, in Hunt county, in July, 1885. He slept at nights at the house of Mr. J. R. Powell. While he was feeding his horses at Powell's barn, on the morning of July 2, 1885, he heard four pistol shots. Soon afterwards he saw an empty buggy and a team pass the house. The horses were then loping. The defendant soon came to Powell's house and said that one of his loves had shot and killed herself. Witness afterwards went with Powell to the body, and afterwards went to Greenville. A mile or two from Powell's he passed the runaway buggy. It was then standing in the road, with two horses hitched behind it. A silk handkerchief lay on the buggy seat. The witness also saw some blood on the buggy seat.

On his cross examination, the witness stated that he lived at Payne's store at the date of the tragedy, and still lived there. He had never testified in this case before, and had never told any one about what he knew or saw, since he was subpœnaed, now a year ago. He could not now say what, or to whom, he told about it before he was subpœnaed. Witness was about one hundred yards from Powell's house when he heard the four shots fired. They were fired very near together, with a shorter interval between the third and fourth than between the first and second shots. The buggy and horses passed Powell's house within five minutes after the shots were fired. The buggy, when witness afterwards saw it, was standing three or four feet from the road. Witness rode by the buggy without stopping. He did not examine the cushion closely, but saw something on it which looked to him very like blood. This belief was strengthened by the fact that he had seen the dead woman up the road. The blood was spattered on the east end of the cushion. Witness could not say positively that it was blood he saw on the cushion. Witness had carried the mail for ten months at the time of the tragedy, but did not know the name of the post master in Greenville. He had no other acquaintance in Greenville than Charley Hill, at whose place he kept his horse when in Greenville. Witness was at Payne's store during the inquest over the body, on the evening of July 2, 1885. He saw a great many people at the inquest, but told nobody what he had seen on that morning.

J. A. May testified, for the State, that he lived in Greenville, Texas, in July, 1885. About six weeks before the tragedy the defendant borrowed of the witness a forty-four calibre Smith & Wesson pistol, leaving his small, five shooting pistol in the place of it. He didn't tell witness what he wanted with the pistol, nor say anything more to him at the time than that he was going to Caddo Mills. The witness's pistol (the one in evidence) was returned to the witness after the death of Anna Smith by the district attorney. That pistol was not a self-cocking pistol, and was hard to cock and very heavy on the trigger.

Eli Maloney testified, for the State, that he lived near Payne's store, and served as one of the jury of inquest which sat upon the body of Anna Smith. Witness, taking several ladies with him in a wagon, reached the scene of the tragedy between eight and nine o'clock. He went first to the tree under which it was said the deceased was sitting when last seen alive by Mathews and Miss Vansickle. On the west side of that tree, and extending from it, the witness saw the imprint of cloth or clothing, the track of a man and a woman, and some scratches in the sand. He then went to the body, which he examined critically. He saw a bullet hole through the left breast, and a small bruise on the inside of each thigh a little above the knee, and a third one higher up on one of the legs. The bruises extended two and a half or three inches up and down the leg, and were deeper in some places than in others. He also saw a bruise as large as a silver dollar on one of her shins. Witness could not tell whether those bruises were old or fresh. At the inquest, the witness and Doctor Howell took the clothing off the body, and witness examined the said clothing carefully, but observed nothing unusual about any of it. Witness saw a strand of rope, with a loop in one end, lying in the road ten or twelve feet from the body. There was a slip knot in the rope about eight inches from the loop. The loop was large enough to admit the passage of a man's fist. Witness observed no bruises about the neck or arms of the deceased. On his cross examination the witness said that a number of men and women were at the body when he arrived. They were walking from the body to the branch on both sides of the road, hunting for evidence. No blood was discovered by the searchers that the witness heard of. Witness saw no blood on the girl's outer clothing, and but little on the under clothing, and the most of that was at the entrance of the wound. When the witness arrived upon the ground Mr. Powell was standing at

the tree, and appeared to be guarding its approaches to prevent examiners from obliterating the impression at the roots.

C. J. Stegar testified, for the State, that he was a member of the jury of inquest over Anna Smith's body, and made a careful examination of the body and ground. The tree referred to by the previous witnesses as the one under which the girl was seen sitting by Mathews and Miss Vansickle was really two trees standing close together, connected by a root. On the sand banked up at the foot of these trees, the witness saw the impression of clothing which indicated that some person had either been sitting or lying there. Further out from the tree the witness saw the impression of the heels and toes of a shoe or boot. The toe impressions were nearer together than the heel impressions, and extended further out from the tree. There was a a bruise on each of the thighs, which looked fresh to the witness, and which from the size and shape he thought were made by finger nails. Witness saw no bruise on either the neck or arms. He saw a small bruise on the right fore finger. Mr. Powell had a rope in his hand at the inquest, which had two loops in it, and a stain of some kind on it. On his cross examination this witness stated that he examined the ground on both sides of the road from the point where the body lay.to the branch, but made no other discoveries than those he had mentioned. He could not trail the woman's track from the trees. Witness could readily tell the difference between the impression made on sand by a woman's dress and that made by anything else. His knowledge in this respect was based upon experiment. The impression in this case showed from the legs to the back, toward the tree. Witness could tell the difference between the impression of a toe and heel. If a person lies down and braces with the heel, 'the heel will sink into, and the toe will scrape, the ground. The impressions observed by witness were not over three and a half hours old. There was a considerable difference between a track and impression two and a half and one six hours old. The tracks described by the witness were nearly in the edge of the road. Witness had often bruised his own person, and knew that such bruises, when fresh, were of a blue color, and turned black when grown older. He did not know how such bruises would be affected by death.

W. W. Adams, another member of the coroner's jury, testified, for the State, that when he reached the body there was no one there but the Powells and the defendant. The body lay in

the road, about one hundred yards south of a certain tree which stood on the road side near a branch. An impression at the foot of that tree showed that some person had recently sat there. The tracks of two different persons, being of different sizes, showed around the tree. The witness saw two bruises on the girl's legs, which appeared to have been made by pinching. There was another small bruise on the right forefinger. When the witness arrived upon the scene the defendant was talking, weeping, moaning and "taking on" greatly. He told witness that Anna Smith had shot and killed herself; that, while he was hitching his horses to his buggy she snatched his pistol from his hip pocket and shot herself; that he then took the pistol from her and shot himself, intending to kill himself, but that his nerve failed him; that he would be accused of the murder of the girl, but was innocent, and would give five hundred dollars, one thousand dollars, or the world, if he could but recall his last six hours. He said also that the last words Anna Smith said to him were "Henry, don't do that," but did not tell witness what it was the girl told him not to do. On his cross examination the witness said that he examined both sides of the road from the body to the branch, but discovered no impressions other than those at the foot of the tree. There was but little blood on the underclothing. The girl, when killed, had on a black velvet sacque, a corset under the sacque, and a chemise under the corset. Her skirt was of white material. There was no blood on the skirt. The bruised places mentioned by the witness were discolorations of the skin, about the size of a finger nail. Both the clothing and the flesh of the deceased at the entrance of the wound were powder burned. The powder burn on the skin extended from the wound to the shoulder. The black velvet sacque showed the scorch or powder burn but little, but the underclothing showed it considerably. When the witness reached the body the defendant was lying down by the side of it, with his arm under the head, and was weeping and wailing like one who had lost a near relative. He appeared to be in sore grief. Defendant remained on the ground until he was arrested. Witness saw the pistol with which it was said Anna Smith was killed. It was a very large weapon.

W. B. Horton testified, for the State, that he was the constable of Greenville precinct in Hunt county, and as such officer, he attended the coroner's inquest upon the dead body of Anna Smith. While that inquest was in progress, the witness observed a bruise on the back of the deceased's neck, and also the bruises

described by the previous witnesses. The bruise on the neck was about three inches long, and was about as wide as a man's finger. On his cross examination, the witness said that he left Greenville about eight o'clock in the morning, and reached Payne's store, sixteen miles distant, at about eleven o'clock. He saw the defendant's buggy at the store, and examined it, but found no blood on it, nor on the cushions. Deputy Sheriff Chaffin took defendant to Greenville in that buggy. Witness saw Will Shamburger's wife at the inquest.

Deputy Sheriff A. B. Chaffin testified, for the State, that he brought the defendant to Greenville in the buggy that defendant was said to have used during the night before. If there was any blood on that buggy or on the cushions, witness did not see it. Witness saw the body at the inquest and observed the bruises described by the witness Horton.

Miss Ada Minchen testified, for the State, that at one time she was engaged to marry the defendant, but was not engaged to him at the time of the tragedy. She formed the acquaintance of the defendant in 1876, and for three years thereafter he visited her regularly, and since that time he had waited upon her periodically. Witness had often gone out under the escort of the defendant. His conduct towards her, and towards all other ladies, so far as she was advised, had always been exemplary.

George Jones testified, for the State, that he did not attend the inquest over the body of Anna Smith. He went to the place of the tragedy after the arrest of defendant, and took charge of the defendant under the order of the magistrate. Witness took the defendant to the tree described by previous witnesses and there saw the imprint of the clothing so often described. He also observed what he took to be the imprint of stockinged legs. About five feet from the root of the tree he saw what he took to be the impressions of toes or heels. On his cross examination, the witness said that he reached the ground about ten o'clock. He could not say what kind of cloth or clothing made the impression he described. What he took to be the imprints of stockinged legs were about two and a half feet apart, and ran with the course of the cloth print. They were about a foot and a half long. They did not turn out or widen at the lower end. Witness could not tell whether the other impressions he saw were of heels or toes, nor where the rest of the feet came to. The heel or toe prints were near the end of the impression made by the stockinged legs.

J. P. Powell testified that he heard four shots which were fired in rapid succession, at about daylight. He did not think a person could count more than two between the first and second shots. When he reached the body, word having been sent him by the mail carrier, he found his brother, J. R. Powell, the man Williams and one or two other persons on the ground. Defendant was then lying down by the body, in evident great distress.

A. E. Waldron testified, for the State, that he attended the ball at Roberts Station, on the night of July 1, 1885, and saw the defendant and the deceased there. Defendant appeared to be ill at ease, as though he had something on his mind. The deceased appeared cheerful and happy.

On his cross examination, the witness said that he saw at the ball, besides the defendant and Miss Smith, Governor O. M. Roberts, Perry McBride, Doctor Mings, Miss Mathews, Miss Vansickle and others. When witness first observed the defendant on that night, he was talking to Mr. Mathews. He had previously seen the defendant, but had no acquaintance with him. He did not see the defendant and deceased promenading together on that night. Witness now lived in Detroit, Michigan, but at the time of the tragedy lived at Roberts Station, in Hunt county, Texas.

A. Cameron testified, for the State, that, on the evening before the death of Anna Smith, he stepped from the street into the Hunt county bank, of which, until recently before that evening, he had been cashier, and saw the defendant in front of the cashier's desk. The defendant was then in the act of placing a considerable roll of money in his pocket. The roll was of the size of a man's wrist. Defendant then lived south of Greenville, and owned a farm and gin. He did considerable business with the bank during the time that witness was cashier, and witness often paid him large sums of money. He often bought and paid for machinery. No ginning was being done in Hunt county in July, 1885.

At this point the State introduced in evidence the order of the district court of Hunt county, changing the venue of this cause to Kaufman county, which said order recites that, because of prejudice against the defendant in Hunt county and combination of influential citizens against him, he could not get a fair trial.

The State then closed.

Mrs. Isaac Smith, the mother of the deceased, was the first witness introduced by the defense. She testified, in substance,

that the deceased left home on the Saturday preceding her death. Witness saw her again on the following Wednesday, when she came to the house in a buggy with Miss Lou Vansickle, going to Greenville. She said that she would come back and get her clothing, which she did. The deceased and her father had quarreled before that time. Deceased disobeyed some direction given her, and her father threatened to whip her, and finally did whip her. She had just returned home drunk from Caddo Mills, and her father was also under the influence of whisky. Witness and her family moved to Hunt county in the fall of 1884. She had never known the deceased to drink before coming to Hunt county. The whipping of the deceased by her father occurred a short time before the death of the former. During the quarrel which preceded the whipping, the witness sent for Mr. Johnson to come to the house and stop the row. On one occasion, at night, the witness missed the deceased from her room, and when she returned to the house witness took her to task about it. Prior to her death, the deceased kept company with Mr. Grimes, Mr. Daggett, Mr. Johnson, Allen Smith, Mark Hale and the Lee boys. She often attended parties and other social gatherings. A letter (which will appear in a subsequent portion of this statement) was written by the deceased on the fly leaf of a book, on the Monday morning. before the tragedy, just before she left home.

Cross examined, the witness stated that the deceased formed the acquaintance of the defendant in the spring of 1885, when she lived at Mrs. Johnson's. The objections urged by witness and her husband to her association with the defendant caused the trouble between deceased and her home people. On one evening the defendant called to take the deceased to a school exhibition at Caddo. Upon his promise to bring her back before sundown, her father consented, and deceased and defendant went off. The deceased did not come home until the next evening, when she was very drunk. She and her father had a row. Witness objected to deceased's association with defendant because he gave her whisky. Deceased had always before taken a drink whenever she wanted it, but witness had never known or heard of her being drunk until she went to Caddo with defendant. Deceased was about seventeen years old, was obstinate and hard headed and not easily controlled. When she wrote the letter referred to by witness, she said that she was going to leave home.

At this point the defense introduced in evidence the letter referred to by the witness. It reads as follows:

"Good-bye to the family. Forget, but I will not ask you to forgive. I have disgraced you, but I will never more impose myself upon you. Jim, I am no one to give advice, but do as you are doing now, and let no one have influence over you. Belle, do just the opposite of what your disgraceful sister has done, and the world will honor you. Beula, mind Ma, and be a good girl. Ma, I am sorry it is so I have to leave you, but it is too late to repent now. Pa, never spoil another one of your children by giving them too much rope. For your soul's sake, and for the sake of a family who look to you for support, quit the damnable cup. It has ruined you and me. And now forget that I ever existed. To those who once were friends of mine, I ask them to think of me only when I was good. Now farewell, for time eternal!                                ANNA."

Bose McFarland testified, for the defense, that he lived in Fannin county, and knew the Smith family when they lived in that county. He knew the deceased from the time she was large enough to go to school until she removed with her father's family to Hunt county. Deceased was a lively girl, and very full of fun, but never drank intoxicants, so far as the witness knew. Witness saw her at a protracted meeting in Fannin county one night not long before her family moved off, and talked with her for a few minutes. She was exceedingly lively and talkative on that occasion, but if she had taken a drink, witness did not detect it. She walked home with Charley Briggs on that night, and en route hallooed to several of the boys passing along the road. Deceased's father was then a very poor man.

Jeff Johnson testified, that he knew the deceased for nine years before her death, but saw little of her from her childhood until she moved to Hunt county in the fall of 1884. Witness's brother married a cousin of the deceased. Deceased's father lived about three hundred yards from witness's house in Hunt county. About June 1, 1885, deceased's sister came to witness and his brother, and asked them to go to the house of the deceased's father and stop a quarrel that was then in progress between deceased and her father. When witness reached Smith's house he found deceased on the bed, and her father on her, holding her hands—they were both drunk and cursing each other. It seemed

that deceased had left home without consent and that old man Smith had attempted to whip her. He told her that she had either to leave his house or obey him, and that unless she would do his bidding she could not stay under his roof, and must hunt another home. She replied that she would do so or play "Jim Fisk." Witness and others dragged old man Smith off the girl and into the yard. They made repeated efforts to get at one another and cursed each other violently. Deceased said that the old man got the advantage of her by taking her weapons. Witness saw deceased drink whisky several times, but never saw her under the influence of whisky but the one time mentioned. Her reputation for chastity was bad, and to witness's knowledge had been bad since Christmas, 1884. Witness heard, as early as the said Christmas, that she was criminally intimate with men, and since that time had heard that she had maintained illicit relations with the defendant.

J. W. Hulsey, justice of the peace of the Caddo Mills precinct of Hunt county, testified, for the defense, that the father of the deceased and he were cousins. Witness lived within half mile of Smith in 1885. He knew that, at the time of Anna Smith's death, or for some three or four months prior thereto, Anna's reputation for chastity was bad. Witness never heard of her maintaining illicit relations with men until she got to going with defendant. She was soon after said to serve other men. Witness had heard that she was kept by defendant, and had also heard that she was kept by Ike Lee.

Thomas Murphy testified, for the defense, that prior to the tragedy he lived within a mile and half of the deceased. The reputation of the deceased for chastity was bad for several months before her death. It was generally reported throughout the neighborhood that she maintained carnal relations with Ike Lee and Mack Hale. Witness saw her at a pic nic with Mack Hale in the spring of 1885. They arrived at about twelve o'clock, got some lemonade, and immediately left in a buggy. Anna's clothing was then rumpled, and had fresh dirt on it. Defendant's reputation had always been that of an honest, peaceable, law-abiding citizen. On cross examination the witness said that he first saw the defendant and Anna Smith together at a party at Browning's, in Greenville. Defendant and the girl were then reputed to be too intimate. Defendant was regarded in Greenville as a man responsible on his word. He was good for his debts, and good on notes in bank. Witness never heard of de-

fendant bothering virtuous women. With respect to lewd women he stood on a par with other young men. Other men were reported to have maintained illicit relations with Anna Smith before defendant's name was coupled with hers.

W. S. Grimes testified, for the defense, that he first met the defendant at Jim Johnson's house—whose wife was a cousin to the deceased—in October, 1884. The deceased was a fast, lively girl. Witness had often seen her drunk, and had seen her under the influence of whisky, but personally knew nothing criminal about her. He met deceased and her father at Mr. Lee's house in the spring of 1885. The parties present, including deceased and her father, drank distilled alcohol. Deceased took two drinks. Her father took several drinks and made deceased sing for the crowd. Deceased's reputation for chastity was bad. On Christmas night, 1884, at a party at Jim Johnson's house, witness saw deceased and Ike Lee lounging together on a single bed. She spent one night in February, 1885, at Jim Johnson's house, in the absence of Johnson's wife. She and Johnson occupied the same room, in which, however, there were two beds. Witness went to Smith's house on the night of the row between deceased and her father, testified to by Johnson. Deceased was in her night clothes on the bed. She and her father, who was dressed, had hold of each other, and were cursing each other. Her father was pulled off the deceased and dragged into the yard. Deceased's evil reputation for chastity dated back to Christmas, 1884. Her name, in that connection, was coupled with those of Ike Lee and Mack Hale, and with others, before it was coupled with the defendant's.

Cross examined, the witness stated that he would not undertake to say that deceased and Johnson slept in the same bed on the night in February, 1885, that deceased stayed at Johnson's house, but they did occupy the same room on that night. Defendant went with all the ladies in his neighborhood during the time that his name was coupled with that of deceased. His reputation was "that he liked women." Witness knew that defendant "kept" deceased when she was in Greenville. In this connection witness mentioned the names of a dozen or more good and virtuous young ladies upon whom defendant waited during the time that he was reputed to maintain criminal relations with the deceased. He associated with a great many poor and virtuous young ladies. On the night of the row between deceased and her father, the deceased told her father, when he said something

about her leaving home, that she would leave and play "Jim
Fisk at Long Branch." Witness had often heard her sing the
Jim Fisk song to the young men.

Doctor Nays testified, for the defense, that he twice had the
deceased under his professional care, once in the fall of 1884 and
once in the spring of 1885. He smelled whisky on deceased's
breath on his first visit in 1884. Her malady on the second occa-
sion arose from excessive use of alcoholic liquors. At times, on
both occasions, she was wild and frantic, would "cut up" gen-
erally and stand on her head. Then her system would relax and
she would grow morose and apparently desperate, and would
appear to suffer greatly from melancholia. The witness did not
examine the body of the deceased, but he did not think that the
bruises on her legs could have been made less than twelve hours
before her death, judging from the color ascribed to them by
other witnesses. This was not the witness's professional but his
individual opinion. Witness could not say that whisky alone
produced the deceased's condition when he first called to see her
in 1884. She was suffering from the effects of intoxicants and
other causes.

Robert R. Skinner testified, for the defense, that he attended
the ball at Roberts Station on the night of July 1, 1885, and saw
deceased, defendant, Mathews, Miss Vansickle, Governor O. M.
Roberts, Perry McBride and others among the guests. Deceased
appeared to be very despondent on that night. Witness danced
one set with her and afterward took a promenade with her.
During that promenade the deceased told witness that her father
had beaten her and her family had driven her from home; that
she had nothing to live for and had no desire to live longer.
Witness remarked that her talk was nonsense. She replied that
she would "as soon kill herself as not," and that she had tried
once and failed. Defendant appeared to be in his usual spirits
on that night.

Allen Smith testified, for the defense, in substance, that he
knew Anna Smith well. She was very fast, permitted the boys
to take any liberties with her, such as fondling her person, and
had a bad reputation for virtue long before defendant became
acquainted with her. Witness went with deceased a great deal,
and had often heard her say that she had nothing to live for, and
had as soon take her own life as not. Witness was very inti-
mate with defendant. Defendant once told witness that he was

keeping deceased, and that, as she was hard to get along with, or to get rid of, he expected to have trouble with her.

Mansel Mathews, recalled by the defense, testified that, almost daily, for a long time after the tragedy, he used the buggy used by defendant and Anna Smith on the fatal ride, and never saw any blood on the cushion or any other part of the said buggy. A short time before leaving Roberts Station, on the fatal night, witness and defendant discovered that some boys had taken their buggies off. Witness went into the ball room for the girls, and when he came back he found that defendant's buggy had been brought back, but that his had not. He found the defendant with an old rope in his hand, which the witness had thrown into the buggy to be used as a hitch rein. Defendant had tied one end of that rope around the axle of his buggy, and was tying the other end to the shaft of an old sulkey standing near. He laughingly remarked that he had no intention of leaving the witness and Miss Vansickle at the station, and that he was fixing a rig in which to take witness home. About that time witness's buggy was returned, and defendant threw the piece of rope into the box of his buggy. That was the piece of rope found on the scene of the tragedy.

Miss Lou Vansickle was next introduced by the defense. She testified substantially as she did on the habeas corpus trial of the defendant. Her testimony on that trial will be found in detail in the nineteenth volume of these reports, commencing on page 572. She stated, in addition, that, after her return to the place of the tragedy, and before the body was removed, she drove to Mrs. William Shamburger's house in the buggy used over night by defendant and deceased, and brought Mrs. Shamburger to Payne's store. She knew then that there was no blood on the buggy or the cushion. She also corroborated Mathews as to the incident of the rope, buggy and sulkey at Roberts Station, just before the party started home.

Mrs. Surella Shamburger's testimony, on the defendant's habeas corpus trial, will be found on page 577 of the nineteenth volume of these Reports. She testified on this trial substantially as she did on that, and, in addition, that she rode from home to Payne's store on the day of the tragedy, in a buggy said to have been the one used the night before by defendant and deceased. She saw no blood on that buggy.

Several witnesses testified that the reputation of the deceased for chastity was bad before she became acquainted with the

defendant; and a dozen or more supported the reputation of the defendant as a peaceable, quiet and law abiding citizen.

The defense closed.

Miles Vansickle was the first witness called by the State in rebuttal. By referring to the testimony of Miss Vansickle, on the defendant's habeas corpus trial, it will be seen that she then testified that, on a trip taken by her, deceased and defendant, at night, some time prior to the tragedy, the deceased got out of the buggy a short distance from a branch or creek, and went alone to the creek; that, a few minutes later, a splash in the water was heard, when the defendant went to the branch, leaving her, Miss Vansickle, sitting in the buggy; that, after remaining in the creek bottom for some time, defendant and deceased returned to the buggy, and the deceased was wet from head to foot. Referring to this testimony of Miss Vansickle, her father testified that he saw deceased when she returned to his house on the night referred to by his daughter, but that he saw no wet garments on her. At the time referred to by witness and his daughter, there was not enough water in the creek to immerse a person. Several witnesses for the defense having testified that, although he sometimes took a drink, the defendant was a temperate man, this witness testified that he knew the defendant to be a drinking man, but knew many men who drank more than he did.

Ike Lee testified, for the State, in rebuttal, that he knew the deceased all of her life. He had never heard her reputation for chastity called in question until she began to associate with defendant. Defendant was reputed to be a man who drank sometimes.

James Johnson testified, for the State, in rebuttal, that he had never paid any particular attention to the deceased or to the rumors affecting her character. He heard, about Christmas, 1884, that she was too intimate with Ike Lee and Mack Hale. She formed defendant's acquaintance in February, 1885. Defendant was reputed to be a man who drank too much sometimes, and who was very fond of women.

Miss Belle Smith, sister of the deceased, testified that she saw the deceased write the letter in evidence. Deceased wrote it on Monday morning before leaving home, and told witness she was writing it because she was going to leave home.

*E. W. Terhune, R. L. Porter, E. B. Perkins* and *Clark & Morrow,* filed an able brief and argument for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE. This prosecution was instituted in Hunt county, but on motion of the defendant the venue was changed to Kaufman county, and the conviction was had upon a trial in the latter county.

On the trial the State, over defendant's objections, read in evidence to the jury the order of the district court of Hunt county changing the same. This order recites that there exists such a prejudice against the defendant in Hunt county that he can not get a fair trial, and that there is a combination of influential persons against him in said Hunt county.

It was error to admit said order in evidence. It was wholly irrelevant to the issue on trial. It was merely a record of the court showing the jurisdiction of the district court of Kaufman county over the case. It was not a matter of evidence for the jury, but for the court alone. There was no issue as to the jurisdiction of the court over the case to be determined by the jury, save the simple one of the commission of the offense in Hunt county. It was the province and duty of the court, alone, to determine the question of the jurisdiction of the district court of Kaufman county to try and determine the case. An instruction to the jury that the venue of the cause had been changed from Hunt to Kaufman county, and that, if the proof showed the offense was committed in Hunt county, the venue was sufficiently proved, was all that was necessary, and all that was proper with reference to the matter of jurisdiction. A complaint upon which an information is based is not admissible evidence for the State. Even the information or indictment in a criminal case can not be used as evidence of the facts charged therein. They only serve the purpose of pleadings. So, an order changing the venue in a criminal cause only serves the purpose of transferring the cause to another jurisdiction, and furnishes to the court of such other jurisdiction evidence of its authority to try said cause. It is for no purpose competent evidence to go before the jury. (Long v. The State, 17 Texas Ct. App., 128.)

Evidence, to be admissible, must relate to facts in issue, and to relevant facts. In this case the fact in issue was the guilt of

the defendant of the crime with which he was charged. The order changing the venue in the cause in no way related to that issue. It tended in no degree to prove or disprove said issue. But, notwithstanding its irrelevant character, its recitals were well calculated to prejudice the minds of the jury against the defendant. Hunt county was the home of the defendant, and the county in which the alleged offense was committed. The order showed that it was upon his motion that the cause had been transferred for trial from the county of his home; from the people among whom he resided, and who were acquainted with him, to another county, and upon the grounds that in his own county, and among those best acquainted with him and with the facts of the alleged crime, there existed against him such a prejudice as would prevent him from having a fair and impartial trial in said county, and that there existed against him in said county a combination of influential persons, etc. A recital of these facts to a jury would naturally and certainly prejudice their minds against the defendant. A defendant is entitled to a verdict on competent evidence, and the admission of incompetent evidence, such as might influence a jury, requires a conviction to be set aside, even though there be sufficient legal evidence to sustain it. (Draper v. The State, 22 Texas Ct. App., 404.)

Furthermore, the error of admitting the incompetent evidence referred to was intensified by the comments thereon of the State's counsel in his concluding argument to the jury. These errors were not and could not be cured by the instruction of the court to the jury not to consider the fact that the venue had been changed. (Myers v. The State, 6 Texas Ct. App., 19.)

With respect to other evidence admitted over defendant's objections, we do not think any material error was committed.

In one particular we think the charge of the court is erroneous. In charging upon the defendant's theory that the deceased killed herself, the language of the charge is as follows: "If from the evidence you believe that Anna Smith took her own life, that the fatal shot which deprived her of life was not fired by the defendant, but by her own hand, or by any other means than the act of the defendant, then he is not guilty and you should so find." This paragraph of the charge in effect devolves upon the defendant the burden of proving his innocence. It requires the jury to believe from the evidence that he was not guilty; that he did not kill the deceased; but that deceased killed herself. The instruction should have been that if, from all the evidence,

the jury entertained a reasonable doubt whether defendant killed the deceased, or whether the deceased killed herself, they would acquit him. (White v. The State, 19 Texas Ct. App., 158; Humphries v. The State, 18 Texas Ct. App., 309; Jones v. The State, 13 Texas Ct. App., 14; Dubose v. The State, 10 Texas Ct. App., 253.)

Because of the errors we have discussed, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered December 14, 1887.